[Civil No. 3372.   Filed March 12, 1934.]

[30 Pac. (2d) 491.]

L. B. PRICE MERCANTILE COMPANY, a Corporation, Defendant Employer, Petitioner, v. THE INDUSTRIAL COMMISSION OF ARIZONA, J. NEY MILES, HOWARD KEENER, L. C. HOLMES, Members of Said Commission, LEONA PEARL EVANS, Widow of L. D. EVANS, Deceased, AUDREY NAOMA EVANS and WANDA JEAN EVANS, Their Minor Children, Applicants, Respondents.

258

Messrs. Armstrong, Kramer, Morrison & Roche, for Petitioner.

Mr. D. L. Cunningham (Mr. Don C. Babbitt and Mr. Emil Wachtel, on the Brief), for Respondent Industrial Commission of Arizona.

Mr. Frank H. Lyman, for the Widow and Daughters of L. D. Evans, Deceased.

McALISTER, J.—The petitioner, L. B. Price Mercantile Company, brings before us for review an award of the Industrial Commission in favor of the wife and two daughters of L. D. Evans, who was killed in an automobile accident on January 19, 1933, while working for the petitioner. The Commission found that the injuries causing his death were sustained in an accident which arose out of and in the course of his employment, and the petitioner contending that the evidence does not support this finding asks that the award be set aside.

It appears that on September 14, 1932, L. D. Evans entered into a written contract with the petitioner by the terms of which he agreed to sell on commission for the latter certain articles of household goods such as blankets, bed linens and other fittings for the home, at prices furnished him by the petitioner who was designated throughout the contract as employer while Evans was referred to as employee. The goods were furnished him by the Phoenix manager of the company and were sold by him on weekly or monthly

installments, though a purchaser could pay in full at the time of sale and occasionally did. When a sale was made the buyer signed a lease-agreement covering the transaction and Evans turned these in to the local manager of the petitioner each Saturday with the collections thereon less his commissions. At the same time he returned the unsold goods and the following week received a new consignment. Upon turning in a lease, his connection .with that transaction ceased. The company collected the balance of the purchase price through another representative and if the down payment was not sufficient to take care of his commission it was paid him when collected, though the testimony discloses that the company gave him the balance of his commission when he turned in the lease without waiting for other payments. If, however, the purchaser defaulted the goods were charged back to Evans and he had either to resell them or pay for them. No sale became binding on the employer until approved by it and in case of rejection the employee agreed to repossess and deliver the goods to the employer or in lieu thereof to account for them in cash. Evans was prohibited from selling to certain classes of people; for instance, sporting people, unmarried employees living away from their parents, transient people, or persons designated from time to time by their employers as unreliable.

In addition to the regular commission Evans was allowed five per cent. on each sale for compensation for maintaining his automobile for transporting the merchandise and for instructing other salesmen of the employer. The right to designate in what cities, towns and localities its goods could be sold only on monthly payments, or only on weekly or monthly payments was reserved by the employer. The employee, however, was free to come and go and to sell the goods when and to whom he saw fit in the communities where he was engaged to work, though he was

required to give his entire time and energy to the work.

According to paragraph 16 of the contract it could be terminated on one day's notice at the option of either party, though the Phoenix manager of the petitioner testified that he could not discharge Evans except by declining to furnish him goods to sell.

The evidence discloses that on January 19, 1932, about 1 P. M., Evans was driving south on Sixteenth Street and that in approaching McDowell Road he failed to observe just north of it a large stop sign on Sixteenth but drove into the intersection at a speed of thirty-five or forty miles an hour, and in so doing struck the side of a car going west on McDowell Road. The collision caused his car to skid across the street and overturn, killing him almost instantly.

About twenty minutes before this occurred, the Phoenix manager of petitioner, E. D. McCamy, had a conversation with Evans at Osborn Road and Seventh Street. He testified that he noticed Evans was under the influence of intoxicating liquor and told him that he, McCamy, would save him time by collecting some money due him by a Mrs. Thompson who lived north of Osborn Road and had purchased some blankets from him.

One Robert Hayes testified that he saw Evans about 10 o'clock that morning and that he was under the influence of liquor and unfit to drive a car.

The testimony of the wife and brother-in-law of Evans who saw him every day, however, was that he did not drink; that they never had known of his drinking and that Mr. McCamy told them a day or so following the accident that there was nothing the matter with him when he, McCamy, saw him about twenty minutes before the accident.

The petitioner contends that these facts show that Evans was not an employee but an independent con-

tractor, for the reason that in selling its goods he was not subject to its rule or control, except in effecting the result sought in accordance with its desires. About the only matter left to him to decide was the amount of the down payment on any sale, whether more, equal to, or less than his commission. The petitioner, it is true, suggests that it was his duty to determine also whether the purchaser should pay the whole amount in cash, or in monthly or weekly installments. There was in reality nothing for him to decide on this point, because deferred payments were contemplated and the money of any person desiring to pay cash was not refused, and the petitioner reserved to itself the determination of the question whether the payment should be made by the week or by the month. While it was in a sense up to him what particular hours of the day he worked, yet the contract required him to give the job all his time and energy.

It is clear from the facts that the company exercised control over Evans not merely in effecting the results desired but also in the manner of bringing them about and that independence of action was allowed him in only one or two minor particulars. He agreed to and did dispose of the goods of the petitioner in the manner directed by it which was in substance this: He procured each week at its place of business in Phoenix a consignment of merchandise, sold it in and around the city of Phoenix at prices fixed by the company and on lease forms prepared by it, turned in each Saturday the leases and unsold goods together with the amount collected, less his commission, and made on each Monday a report to the company on forms prescribed by it of the previous week's work. He was at all times subject to discharge by the company if it decided it no longer needed his services, for either party to the contract could terminate it on one day's notice. It is true

the Phoenix manager of the company testified that he could not discharge Evans but admitted that he could decline to furnish him any more goods to sell, and it is difficult to imagine a more effective method of terminating a contract of this character than to refuse him the necessary merchandise with which to carry on his work. The petitioner contends that it could not discharge him because there were or might be due him commissions on sales already made. The testimony is that in practice Evans was paid in full on each sale when he turned in a lease, but if this were not true the fact that he may have had something coming on sales theretofore made did not prevent the company from refusing to allow him to make new sales, and such a refusal could not have rendered the petitioner liable for a breach of its contract with Evans but merely have necessitated a satisfaction of any unpaid commissions.

These facts clearly bring the case within the rule announced by this court more than once that whether a person is an employee or an independent contractor depends upon the answer to the query, Did the company for whom he was working retain supervision or control over the work he was performing? In *Grabe* v. *Industrial Com.*, 38 Ariz. 322, 299 Pac. 1031, 1034, this language was used:

"Under section 1418, *supra,* if A procures B to do certain work for him which is a part or process in A's trade or business, and retains supervision or control over the work, then B and all B's employees and subcontractors to the Nth degree are, for the purposes of the Compensation Act, employees of A, no matter what the terms or method of employment or compensation. . . . If the work be part of the regular business of the alleged employer, does he retain supervision or control thereof? All other matters are of importance only as they throw light on this question."

And in determining if the employer retains control the most important factor is whether either party may terminate the relation without liability. "Where such right exists," to use the language of the court in *Industrial Com.* v. *Hammond*, 77 Colo. 414, 236 Pac. 1006, 1008, "the workman is usually a servant. Where it does not exist, he is usually a contractor." The power of the employer to end the employment at any time he sees fit is incompatible with the full control of the work which an independent contractor enjoys. 14 R. C. L. 72; *Press Publishing Co.* v. *Industrial Acc. Com.*, 190 Cal. 114, 210 Pac. 820; *New York Indemnity Co.* v. *Industrial Acc. Com. of California*, 80 Cal. App. 713, 252 Pac. 775; *Clark's Case*, 124 Me. 47, 126 Atl. 18. In *Industrial Com.* v. *Bonfils*, 78 Colo. 306, 241 Pac. 735, 736, the court said:

"By virtue of its power to discharge, the company could, at any moment, direct the minutest detail and method of the work. The fact, if a fact, that it did not do so is immaterial. It is the power of control, not the fact of control, that is the principal factor in distinguishing a servant from a contractor. *Franklin Coal & Coke Co.* v. *Ind. Com.*, 296 Ill. 329, 129 N. E. 811. The most important point 'in determining the main question (contractor or employee) is the right of either to terminate the relation without liability.'"

The fact that Evans was paid commissions on each sale rather than a monthly, weekly or daily wage did not make him an independent contractor. One paragraph of the syllabus in *McKinstry* v. *Guy Coal Co.*, 116 Kan. 192, 225 Pac. 743, 38 A. L. R. 837, reads as follows:

"A workman who is paid wages by the piece or quantity comes within the Workmen's Compensation Act the same as one who is paid by the day."

While it is by no means controlling it might be well to state also that the petitioner itself intended that Evans should be an employee and regarded him as

such. This clearly appears from the fact that the contract it had him sign refers throughout to itself as employer and Evans as employee.

It follows that the relation between petitioner and Evans was not that of independent contractor but that of employer and employee.

It is contended, however, that even though Evans was an employee of petitioner at the time he was killed the accident which caused his death did not arise out of or in the course of his employment, because he drove past a stop sign into an intersection at an unlawful rate of speed and in so doing violated the law of the state of Arizona. The position is that while driving an automobile was an act in the course of his business and necessary to carry it on properly, his driving it in the manner prescribed did not constitute an act in the course of his employment, the claim being that before such a result may follow and an injury flowing therefrom held compensable it must appear that his employment required him to speed through the intersection in violation of the state law. To support this contention petitioner cites *Ocean Accident & Guarantee Corp.* v. *Industrial Com.*, 32 Ariz. 265, 257 Pac. 641. In that case the injured person had been instructed by her employer in Phoenix to entertain over the week-end the salesman of a firm whose merchandise the employer sold, and pursuant to these instructions she took him to Prescott, Arizona, and at Granite Dells, near there, climbed a rock and fell, sustaining injuries. It did not appear, however, what Granite Dells was, or that the salesman was with her at the time, or that she was following her instructions to entertain him, but, so far as the record discloses, she may have left him in Prescott and gone to Granite Dells with other parties. In this state of the record, the court said that the accident did not arise in the course of the employment unless the climbing of the rock was con-

nected in some manner with her employment, which was entertaining the salesman. It is not disputed in this case, however, that in driving south on Sixteenth Street Evans was following the work he was employed to perform, and the fact that he may have been going at an excessive rate of speed or failed to observe the sign did not have the effect of making him other than an employee in the performance of his work. He may not, it is true, have been as careful as he should have been, but under no Workmen's Compensation Law I have read is it held that an accident, resulting from the negligent, careless manner in which an employee performs his duty, does not arise out of and in the course of his employment. In fact, the whole theory of the Workmen's Compensation Law is to provide compensation for the employee if injured and for his dependents in case of his death, regardless of the fact that the employee might or might not have been negligent.

The petitioner contends, however, that when the negligent act of an employee goes to the extent of violating a criminal law of the state and results in an accident which causes injury, it cannot be held that such an accident arose out of and in the course of the employment. Inasmuch, however, as the negligence of an employee is not a defense to a claim for compensation and the only difference between negligence of this character and that which falls short of violating a law is merely one of degree, the only effect of the former is that it furnishes *prima facie* evidence of contributory negligence, which does not affect the question of the scope of the employment; hence, the fact that it is sufficiently great in degree to constitute a violation of a provision of the Criminal Code sheds no more light on the question whether the accident arose out of the employment than would an act less negligent in degree. *Alexander* v. *Industrial Board,* 281 Ill. 201, 117 N. E. 1040. In discussing the

question whether the fact that an employee was riding an unlighted bicycle in violation of the State Motor Vehicle Act (Stats. 1915, p. 397) the Supreme Court of California in *Western Pacific R. Co.* v. *Industrial Acc. Com.,* 193 Cal. 413, 224 Pac. 754, 757, said:

"The fact that the employee was riding upon an unlighted bicycle did not, as counsel for the petitioner contend, operate to take the employee 'out of the course of' his employment upon the theory that the employee had incurred an added risk not contemplated by the nature of his employment. The fact that he was riding upon an unlighted bicycle constitutes negligence in the course of his employment rather than a circumstance which takes him outside of the course of his employment. It is a matter of common knowledge born of human experience that employees are sometimes negligent, and the negligence of an employee must therefore be included as one of the risks of any employment. The fact that an employee is guilty of ordinary negligence in any given case cannot be said, therefore, to impose a risk and responsibility upon an employer not incidental to the employment. It is not the law of this state that the performance of an authorized duty in a negligent manner will by itself take an employee outside of the course of his employment. Such a defense would be tantamount to a defense of contributory negligence expressly abolished in workmen's compensation cases. . . . The act of the deceased, however, in riding without a light on his bicycle, even if it were shown in the instant case to have been the result of negligence, was negligence of a character which might be anticipated from the nature of the employment which necessitated the use of a bicycle—oftentimes after dark. The very nature of the employment and the method of executing the duties of the employment in the instant case compel the conclusion that there would be times when the employee would be negligent in the operation of the instrumentality used to execute the duties of the employment."

In *Standard Accident Ins. Co.* v. *Pardue,* 39 Ga. App. 87, 146 S. E. 638, 639, the court said:

"The mere violation by an employee of a criminal traffic law is not ground for denying compensation, in case of his injury or death resulting therefrom."

Petitioner contends also that when an injury which results in the death of an employee is caused by his own wilful misconduct the injury is not compensable under the Compensation Law of this state (Rev. Code 1928, § 1391 et seq.). The only injury resulting from an accident which arises out of and in the course of employment that is not compensable under the law of Arizona is one that the employee purposely inflicts upon himself, sections 1421 and 1426, Revised Code of 1928, and the mere fact that in performing work requiring him to use an automobile he drives faster than the Motor Vehicle Code allows into an intersection without observing a stop sign put up by the state and is accidentally killed does not show that he purposely injured or killed himself. There has never come to my attention, either directly or indirectly, an instance of a person's driving at a greater speed than the law permits into an intersection guarded by a stop sign for the purpose of injuring himself. Many people violate these provisions, some unintentionally, and some intentionally but certainly with no purpose of causing injury to themselves. By no construction of the facts can it be said that Evans by crossing McDowell Road in violation of traffic regulations intended to inflict an injury upon himself.

The finding of the Commission is that at the time of his death the average monthly wage of Evans was $80 and the amount of the award is based on this sum. The only evidence in the record on the question is that during the four months and five days he worked—September 14, 1932, to January 19, 1933—

he earned in commissions, including those paid for the use of his car, $169.52, or around $41 a month, and that he made $18.15 of this during the first nineteen days of January, the month in which he was killed. There is some evidence that in addition to the commissions from the sales on installment payments there were some earnings from cash sales, but according to the record they were small and the sales do not justify the conclusion that this amounted to $38 or $39 a month and made up the difference between the sum proved to be earned and that found by the Commission, or, in a word, the difference between about $41 and $80 a month. The evidence, therefore, does not support a finding that he earned $80 monthly, and for this reason the award cannot stand as made. It is, therefore, set aside.

ROSS, C. J., and LOCKWOOD, J., concur.